51 CCPA

**Application of Robert M. COLE.**

**Patent Appeal No. 7033.**

United States Court of Customs and Patent Appeals.

Jan. 23, 1964.

770

Andrew R. Klein, Synnestvedt & Lechner, William P. Cole, Philadelphia, Pa., for appellant.

Clarence W. Moore, Washington, D. C. (J. F. Nakamura, Washington, D. C., of counsel), for Commissioner of Patents.

Before WORLEY, Chief Judge, and RICH, MARTIN, SMITH and ALMOND, Judges.

SMITH, Judge.

The Board of Appeals affirmed the examiner's rejection of claims in appellant's application [1] for a patent on a method and composition in which a low volatility insecticide, such as a pyrethrin, is propelled into the air by the subliming action of a highly volatile solid, such as paradichlorobenzene, a common mothproofing material.

Claims, 4, 7, 9 and 10, all the claims remaining in the application, were finally rejected as "unpatentable over" Electrolux British Patent in view of either Chuck U. S. Patent or Algard British Patent. The issue thus presented arises under 35 U.S.C. § 103 and requires for its resolution a determination of whether the differences between the prior art and the invention as claimed were such that the claimed subject matter as a whole would have been obvious to one of ordinary skill in the insecticide art at the time appellant's invention was made.

Rejected claims 4, 7 and 10 are drawn to a solid insecticide. Claim 4 is representative of this group of claims and is as follows:

"4. A solid insecticide comprising in admixture a first ingredient comprising a 20% mixture of a pyrethrin and petroleum solvent and a second ingredient comprising crystalline para-di-chloro-benzene, the first ingredient comprising from .01% to .02% of the total."

Claim 7 differs from claim 4 in specifying .5 gram of a 20% pyrethrum, 80% petroleum solvent mixture and paradichlorobenzene to make up 500 grams.

Claim 9 is a method claim as follows:

"9. The method of establishing and maintaining, in the atmosphere of an enclosed space, a concentration, effective against insects in flight, of a low volatility insecticide material selected from the class consisting of allethrin and pyrethrins, which method comprises forming a solid mass of a mixture consisting essentially of such material and a solid material selected from the class consisting of paradichlorobenzene, camphor and naphthalene, and ex-

1. Serial No. 406,348 filed January 26, 1954 for Insecticides.

posing said mass to the atmosphere in said space."

Claim 10 covers the "mixture of claim 9."

Appellant has pointed out that the problem faced by the art in using pyrethrin type insecticides is that while they are extremely effective in "knocking down" flying insects, they have very low volatility. This has required their general use in inert solvents in spray guns, or in combination with inert fluid propellants of the halogenated hydrocarbon type to produce aerosols, as in the familiar aerosol insecticide bomb.

As appellant points out, aerosols are fugitive by nature, and the aerosol bomb does not provide an effective means of establishing and maintaining over a substantial period of time an effective concentration of the insecticide in the atmosphere, even in an enclosed space.

In his brief appellant states:

"The present invention involves the discovery that a mixture of a low volatility insecticide of the pyrethrin type with a subliming solid such as paradichlorobenzene will sublime as a mixture and *establish* in the atmosphere *a concentration of vapors including both pyrethrins* and the carrier material * * *.

"Such a combination is particularly effective in protecting clothing in a closet against moths. The paradichlorobenzene is effective against larvae and eggs, but ineffective against moths themselves; the pyrethrins in the air are effective against flying moths but ineffective against larvae and eggs * * *."

Appellant's specification discloses certain limits to the amount of pyrethrins which can be completely vaporized by a given amount of the subliming solid used as the carrier material and points out that in using such amounts the concentration of pyrethrins established and maintained in the atmosphere is as great as the temporary concentration achieved by the use of aerosols.

The prior art relied on by the Patent Office is as follows:

| | | |
|---|---|---|
| Chuck | 2,376,327 | May 22, 1945 |
| Algard (British) | 440,536 | Jan. 1, 1936 |
| Electrolux (British) | 639,937 | July 12, 1950 |

Chuck discloses a composition for use in demothing a closet, or like confined space, which comprises cedar sawdust impregnated with a solution containing paradichlorobenzene and ethylene dichloride as the volatile ingredients for producing a vapor lethal to moths, moth eggs and larvae, and a pyrethrum extract for killing moths by contact. Glycerin and carbitol are added for lengthening the effective life of the composition by retarding vaporization of the paradichlorobenzene and ethylene dichloride.

The British patent to Algard discloses a liquid insecticide for killing insects such as moths and their larvae and eggs. The insecticide is a mixture containing 200 kg. paradichlorobenzene, 220 kg. Borneo naptha, 830 kg. trichloroethylene and 3 liters pyrethrum extract of 18 percent strength per 1,000 liters. The patent points out that the insecticide may be sprayed on an article or into a room to be protected, and that both the liquid and its vapor have a killing action, and further states that the insecticide " * * * does not leave any stains on textiles, furs or other delicate materials."

The British patent to Electrolux discloses combining a volatile, solid insecticidal carrier, such as paradichlorobenzene, with an insecticide, benzene hexachloride (Gammexane), having a low volatility, to form compositions in solid form for treating clothing in a closet to kill insects and their larvae and eggs.

The compositions are asserted to be an improvement over similar compositions containing DDT as the insecticide of low volatility. The patent points out that for treating clothing the improved compositions may be effectively utilized in the spraying device of a vacuum cleaner arranged to operate as a blower to distribute the insecticidal composition in a closet. The quantity of benzene hexachloride is adjusted so that none of it remains as a residue in the spraying device after the carrier has vaporized. The preparation of a satisfactory composition is described in the patent. About 5 percent benzene hexachloride is dissolved in a melted carrier such as paradichlorobenzene. The mixture is allowed to cool and harden, and is then crushed or pulverized. The compositions are stated to be "harmless when applied to delicate objects, especially articles of clothing and the like."

Appellant has directed attention to certain differences between his invention and the prior art. Thus, as to the Chuck patent, appellant urges in his brief:

"The important points to note in connection with Chuck are:

"1. His composition is a liquid, absorbed in sawdust to be sure, but a liquid nevertheless. And he teaches that the vaporization of paradichlorobenzene and ethylene chloride is inhibited or reduced.

"2. Chuck also teaches that the pyrethrins *do not* vaporize, but rather remain on the objects to be protected, where they act as contact poisons."

As to the Algard patent, appellant points out:

"1. Algard's composition is liquid.

"2. Algard's pyrethrins are vaporized by spraying."

As to the Electrolux Limited patent, appellant says:

"1. When Electrolux talk about insecticide laden air, and vaporization of the mixture, they are talking about the spraying phase of their process, where they use heat and mechanical energy.

"2. When the paradichlorobenzene of Electrolux sublimes at normal temperatures, it leaves the 'Gammexane' behind."

The solicitor states in his brief:

" * * * Since the claims specify features of appellant's composition and method not found in Electrolux the question is whether those features would have been obvious."

It is the solicitor's position that since both Chuck and Algard show that pyrethrum extract is a known insecticide material,

" * * * The principal question, accordingly, is whether it would have been obvious to use pyrethrum extract, in lieu of benzene hexachloride, in the Electrolux mixture."

The board held that "it is within the skill of the art to substitute pyrethrin for the benzene hexachloride used by Electrolux, particularly in view of Chuck or Algard."

We agree with appellant that the prior art does not explicitly teach the use of a subliming solid as a propellant for a low volatility insecticide such as pyrethrin. Thus, Algard does not suggest the invention in issue, for when he used paradichlorobenzene and pyrethrum together, he retained the liquid form and the mechanical sprayer. Chuck does not suggest the invention in issue, since his combination of paradichlorobenzene and pyrethrum is liquid and he teaches explicitly that the pyrethrum is left behind when the volatile liquids evaporate.

Appellant has taken the position that the Electrolux patent would lead away from appellant's invention. The solicitor takes direct issue with this position.

Appellant's position in reference to the Electrolux teaching is stated in his brief as follows:

" * * * It teaches that, when a solid mixture of paradichlorobenzene and a low volatility insecticide is exposed to the atmosphere, the paradichlorobenzene sublimes, leav-

ing the low volatility material behind."

It seems to us that the disclosure of the Electrolux patent as a whole does not support appellant's position. The patent states (col. 2, lines 71–82) that effective compositions are formed " * * when the quantity of 'Gammexane' in the composition is adjusted so that none of the insecticidal substance [Gammexane] remains in a spraying device after the insecticidal carrier completely vaporises." Further, the patent states (col. 3, lines 60–65) that the compositions can be satisfactorily applied by a blast of air " * * * although the vapour tension of 'Gammexane' in pure form is unsufficient for it to be applied alone, even when subjected to a blast of air produced by a vacuum cleaner." Those statements seem to us to disclose compositions in which a mixture of benzene hexachloride and paradichlorobenzene is carried off as a vapor.

Appellant urges in his brief that " * * * Gammexane is not effective against flying insects * * *," and was intended by Electrolux to operate, not in the air, but on the object to be treated. Whether Gammexane is effective against flying insects is not shown by any evidence in the record. Statements by counsel in the brief cannot take the place of evidence. In re Walters, 168 F.2d 79, 35 CCPA 1160; In re Casey, 165 F.2d 1019, 35 CCPA 869. Whether Gammexane was intended by Electrolux to operate in the air is not of controlling significance. The question is not what Electrolux may have intended, but what the Electrolux disclosure would reasonably suggest to one of ordinary skill in the insecticide art. In re Lundberg et al., 244 F.2d 543, 44 CCPA 909.

In holding that it would be within the skill of the art to substitute pyrethrins for the benzene hexachloride used by Electrolux, the board noted that both Chuck and Algard show that pyrethrins have been employed in combination with paradichlorobenzene. The equivalence of pyrethrum extract and benzene hexachloride in the combination of lethal ingredients of Electrolux would, it seems to us, have been obvious to one of ordinary skill in this art. We fail to find in claims 9 and 10 any limitations which are not met by such a combination.

Claims 4 and 7, however, distinguish over Electrolux in that claim 4 specifies that the 20% mixture of a *pyrethrin* and petroleum solvent comprises from 0.01% to 0.02% of the composition, and claim 7 specifies that the 20% *pyrethrum*, 80% petroleum solvent mixture comprises 0.5 gram in 500 grams (0.1% of the composition). It should be noted at this point that the statements in the specification and claims with respect to the critical concentrations of insecticides are somewhat confusing. The specification states that "the critical concentration of pyrethrins in para-di-chloro-benzene [to prevent staining] is .01%." The experiment from which this conclusion was derived, however, involved the use of "1/20 of 1% pyrethrum (20% extract)." In order for these two concentrations to be equivalent, therefore, it must follow that *pyrethrum* (as the term is used by appellant) is a mixture composed of 20 parts of a pyrethrin and 80 parts of a solvent. This would mean that if 0.05% of a composition were *pyrethrum*, 0.01% of the composition would be a *pyrethrin*. Thus the specification discloses not only that the critical concentration of *pyrethrins* is 0.01%, but also that the critical concentration of *pyrethrum* (20% extract), is 0.05%. These are but two ways of saying the same thing. If the foregoing assumptions are valid, it is then clear that claim 4 specifies a range (0.01% to 0.02%) for *pyrethrum* (a 20% mixture of a *pyrethrin* and petroleum solvent) which is within the critical limit for *pyrethrum* disclosed by the specification (0.05%). Also, claim 7 specifies an amount of a 20% mixture of pyrethrum and petroleum solvent (0.1%) which would provide a concentration of a pyrethrin equal to 0.02%. This too is within the limit disclosed as critical (0.05%).

The preceding analysis, however, is based on two assumptions which are at the very least questionable. *Is* pyrethrum a mixture of 20 parts of a pyrethrin to 80 parts of a petroleum solvent? *Is* a 20% pyrethrum, 80% petroleum solvent mixture one which contains only 4% of a pyrethrin? Nowhere in either the decision of the board, the examiner's answer, appellant's application or the briefs on appeal are these questions satisfactorily answered, or indeed even considered. And the problem is further complicated by the lack of any indication on the part of appellant as to why claims 4 and 7 were limited to the particular concentrations specified therein.

The Board of Appeals did not consider whether there was any patentable significance in the limitations specified in claims 4 and 7, nor did it consider whether these limitations were adequately disclosed as being critical. Instead, the board took (as asserted by appellant) the "remarkable position" that the absence of similar limitations in claims 9 and 10 warrants the conclusion that the limitations of claims 4 and 7 are per se patentably insignificant.

We do not agree with this position of the board. The absence of limitations in claims 9 and 10 does not warrant a finding that the limitations stated in claims 4 and 7 are of no patentable significance. The significance of the limitations of claims 4 and 7 *may possibly* be disclosed in the specification (albeit with some ambiguity), and the board has not considered whether such limitations would have been obvious in view of the prior art.

In support of the position taken by the board, the solicitor in his brief has stated:

"The law is well settled that a limitation in a claim is generally not regarded as critical if other claims are not so limited. In re Mueller, 214 F.2d 170, 41 CCPA 1007, In re Ripper, 171 F.2d 297, 36 CCPA 743, In re Fear, 136 F.2d 908, 30 CCPA 1197."

The cited cases do not support the proposition of law as thus stated. In the Fear case, the court stated at 30 CCPA 1198: "Claims 1, 2, 5, and 6 are method claims and claims 3 and 4 are product claims. However, all the claims are so closely related that it is not necessary to give them separate consideration." The further statement of the court that the "acidity point of .10 defined in claims 1 and 3 is not critical for the reason that in other claims the acidity of the mix is brought to a desired point not specifically defined" must, therefore, be read in the broader context which was the basis for the decision.

In the Ripper case, the limitation in the appealed claims to "thread" and "spun thread," as distinguished from asbestos fibres, was in issue. The court said at 171 F.2d at 299, 36 CCPA 746: "We are unable to see that such limitation can be held to be a patentable distinction over the prior art." Then follows the statement: "Other claims do not contain such limitation. Therefore, it can not be considered to be critical. In re Fear, 136 F.2d 908, 30 C.C.P.A., Patents, 1197 [58 USPQ 403]." As we have indicated above, we do not think the Fear case supports this proposition.

In any event, we think the correct view is that stated in the later Mueller case where in referring to limitations in claims 5 and 13 the court stated at 214 F.2d at 172, 41 CCPA 1009–1010: "That [limitation], however, is not critical *because there are no unexpected results demonstrated* over separate air injections and it may be noted that claim 1 and the others like it are not so limited." [Emphasis added.]

We would agree that it is an established principle of law that a limitation merely with respect to proportions in a composition of matter or process will not support patentability unless such limitation is "critical." E. g., Minerals Separation, Ltd. v. Hyde, 242 U.S. 261, 37 S.Ct. 82, 61 L.Ed. 286 (1916). We would likewise agree that the criticality of such a limitation must be disclosed in the specification or by affidavit. But

the solicitor would have us accept the much broader proposition that merely because all of the claims do not contain the limitation it is therefore not critical per se. In our opinion such a proposition of law is far from being "well settled" as asserted by the solicitor; indeed, it seems to rest at best upon statements which must be taken out of the context of the decisions in which they appear. The true test as we see it is whether the limitations asserted in certain claims *are disclosed as critical*, and if so, whether the invention disclosed in each claim, so limited, otherwise meets the statutory conditions of patentability. Clearly these questions cannot turn solely on whether or not such limitations appear in all the claims.

To extend the somewhat gratuitous statements found in the Fear and Ripper cases into the rule of law asserted by the solicitor would be to ignore the sound and well established view that each claim of a patent is in theory a separate patent. Kemart Corp. v. Printing Arts Research Laboratories, 201 F.2d 624, 633 (9th Cir. 1953). The "elementary principles of claim interpretation" were stated, in the context of the reissue statutes, in In re Handel, 312 F.2d 943, at 948, 50 CCPA 918, to the effect that

" * * * whenever an element or other limitation is added to or taken from a claim it becomes a claim to a different invention. Yet the whole purpose of the statute, so far as claims are concerned, is to permit limitations to be added to claims that are too broad or to be taken from claims that are too narrow. That is what the statute means in referring to 'claiming more or less than he had a right to claim.' "

The broad proposition that limitations in certain claims are not critical if other claims are not so limited does violence to the basic concept of and reason for separate claims of varying scope. We think the clear meaning of the Fear, Ripper and Mueller cases is simply that where there is a failure to recite the asserted limitations in all the claims, this failure may be a factor to consider *with all other relevant factors* in reaching the final decision as to whether or not the asserted limitations relate to an unobvious difference over the prior art.

We therefore affirm the decision of the Board of Appeals with respect to claims 9 and 10 and reverse the decision of the Board of Appeals with respect to claims 4 and 7 and remand for further proceedings in conformity with this opinion.

Modified and remanded.