55 CCPA

**Application of Franklin W. HERRICK and Louis H. Bock.**

**Patent Appeal No. 7396.**

United States Court of Customs
and Patent Appeals.

June 20, 1968.

Worley, C. J., dissented.

Pennie, Edmonds, Morton, Taylor & Adams, W. Brown Morton, New York City, Charles N. Shane, Jr., Washington, D. C., (Hal E. Seagraves, New York City, of counsel), for appellants.

Joseph Schimmel, Washington, D. C., (Jack E. Armore, Washington, D. C., of counsel) for the Commissioner of Patents.

Before WORLEY, Chief Judge, and RICH, SMITH and ALMOND, Judges.

SMITH, Judge.

A single legal issue emerges from this twice-argued appeal: whether the subject matter sought to be patented is obvious within the meaning of 35 U.S.C. § 103. Because we conclude that the evaluation of that subject matter *as a whole* according to the statutory pre-

cepts may not be sustained, we reverse the decision of the board.

This appeal returns to this court for determination after having been once remanded[1] to the Patent Office. The remand was for further proceedings consistent with our opinion pointing out that the nature of the original rejection, and particularly the excessive number of different combinations of references relied upon, defeated the intent and purpose of 35 U.S.C. § 132. That purpose, which we there made clear, is to insure that applicants for patent are properly apprised of the rejection they must meet.

The remand has resulted in a modified examiner's Answer, and a new decision by the Board of Appeals,[2] having the effect of substantially reducing the number of references to be considered[3] and thereby simplifying the basis for the rejection at least to the extent inherent in that action.[4]

### The Invention

Appellants' application[5] discloses and claims a partially-condensed polymethylol phenol, a method for producing it, a composition of it with an alkali lignin and a process for forming a condensation product of the polymethylol phenol and alkali lignin. Claims 1, 2 and 4 are representative and read:

1. The process for producing polymethylol phenol which comprises reacting phenol with from 2.5 to 3.0 moles of aqueous formaldehyde in the presence of from 0.25 to 1.0 moles of sodium hydroxide, reacting the materials at a reflux temperature to form a polymethylol phenol having a mole ratio of from 2.3 to 2.52 moles of formaldehyde per mole of phenol, cooling the mixture to arrest condensation, adding sulfuric acid and water to the mixture and keeping the temperature below 10°C., separating the condensate as a heavy syrup from an aqueous portion, and washing the condensate with water to free it from inorganic material, said polymethylol phenol being insoluble in water but soluble in alcohol.

2. An improved polymethylol phenol in the form of a heavy syrup having a combined formaldehyde-to-phenol mole ratio of from 2.3 to 2.52 and having a degree of condensation such that it is water insoluble but soluble in organic solvents including methanol, and being free of inorganic material.

4. The resin-forming composition comprising a polymethylol phenol in the form of a heavy syrup having a mole ratio of combined formaldehyde-to-phenol of from 2.3 to 2.52 which is water insoluble containing no free formaldehyde and being free of inorganic material, and an alkali lignin which is free of inorganic material in admixture with the polymethylol phenol, said mixture being soluble in or-

---

1. In re Herrick, 344 F.2d 713, 52 CCPA 1664 (1965).

2. The board consisted of Messrs. Federico and Rosa, Examiners-in-Chief, and Stone, Acting Examiner-in-Chief. Mr. Rosa wrote the opinion of the board.

3. On remand, the examiner and board treated five of the eleven references originally relied upon as "cumulative," and stated that they need not be considered. Thus, we have not considered them.

4. Although a more complete explanation of the reasons for the rejection on the references relied upon on remand would have provided a clarification helpful to both appellants and this court, neither the examiner nor the board elaborated on the *manner* in which the retained references were applied.

We regret that the Patent Office has declined our invitation to sharpen their focus on the factual basis upon which the legal conclusion of "obviousness" is based. We thought it clear that the spirit of our earlier opinion reflected our desire for "greater certainty," rather than "speculation," for a "rational isolation and determination of the legal issues which may be present," and for a statement of the rejection which comports with the "intent and purpose of 35 USC 132," rather than defeats it.

5. Serial No. 625,209, filed November 30, 1956 for "Polymethylol Phenol and Phenolic Resins."

**334**

ganic solvents including methanol and being condensible by heating to an insoluble, infusible resin which has low water absorption and high dielectric properties.

Claim 3, like claim 2, is directed to the polymethylol phenol; claims 5 and 6 are directed to the same composition as claim 4; and claim 8 is directed to the process of forming the condensation product attained with the composition of claim 4.

In the words of the specification, the polymethylol phenol of the invention is:

\* \* \* characterized by having a formaldehyde to phenol ratio of from 2.30 to 2.52, freedom from inorganic constituents, and a state of condensation in such a narrow range that it is water insoluble but soluble in polar organic solvents, and is advantageously useful for forming laminating varnishes, as a component of thermosetting phenolic resin compositions, as curing agent for other phenolic materials, and for other purposes where thermosetting condensates that yield

insoluble, infusible products are useful. The polymethylol phenol is soluble in such organic solvents as the lower alcohols and is compatible with natural [sic] occurring phenolic materials such as lignin, quebracho and phenolic constituents of bark. Compositions of the polymethylol phenol and such naturally occurring phenolic materials are thermosetting and can be used to make molding compounds, and paper laminates with properties equivalent to those made with conventional phenolic laminating resins.
\* \* \*

The products of the invention, being free from electrically conducting electrolytes, can be used to form laminates where dielectric properties are essential. Additionally, they have excellent dimensional stability and resistance to water.

*The Prior Art*

As a result of the action taken on the remand, the claims now stand rejected on prior art consisting of the following:

| | | |
|---|---|---|
| Amann et al. (Amann) | 1,614,171 | Jan. 11, 1927 |
| Thompson et al. (Thompson) | 2,186,687 | Jan. 9, 1940 |
| Reboulet | 2,228,976 | Jan. 14, 1941 |
| Schrader et al. (Schrader) | 2,620,321 | Dec. 2, 1952 |
| Dietz | 2,673,190 | Mar. 23, 1954 |

Martin, "The Chemistry of Phenolic Resins", pages 23, 24, 97 and 127, John Wiley and Sons, Inc., New York, 1956

Amann describes the production of a mixture of phenol alcohols by the treatment of phenols with formaldehyde in the presence of an alkali. It states that dihydroxy diphenyl methane derivatives or higher molecular compounds of resinous character are formed if the reaction is not modulated directly by cooling or the like. Use of 1.5 or more moles of formaldehyde per mole of phenol is

disclosed. The reference includes an example directed to a reaction product having a mole ratio of 2.5 moles of formaldehyde to 1 mole of phenol, which is precipitated by a weak acid while adding water and then concentrated to provide a thin brown oil.

Thompson discloses preparation of phenol-formaldehyde resin compositions to be used in the production of laminated

bodies and as adhesives. The compositions are prepared by reacting formaldehyde with phenol at more than a 2 to 1 mole ratio in the presence of an alkaline catalyst such as sodium hydroxide, neutralizing with an acid and then cooling and dehydrating.

Reboulet discloses the use of a thermoplastic lignin with 50% or more of "a binder having thermosetting characteristics, such as phenol-formaldehyde resin," to provide a thermosetting molded product.

Schrader is directed to an adhesive prepared by mixing together a "base" resin and a "catalytic" or "nucleated" resin. The "catalytic" resin is prepared by reacting 2.25 to 3.5 moles of formaldehyde per mole of phenol in the presence of from 0.5 to 1 mole of a mixture of alkali metal hydroxide and alkali metal carbonate at a temperature between 55° and 70° C. for from 4 to 10 hours. The base resin is described as prepared by cooking under reflux "an aqueous mixture of a phenol, formaldehyde and alkali metal hydroxide in the proportions of 1.4 to 3.0 moles of formaldehyde and 0.5 to 1.0 mole of alkali metal hydroxide per mole of the phenol to a viscosity of about 200 to 500 centipoises at a resin solids content of about 30 per cent."

Dietz discloses preparation of a condensation product using formaldehyde and phenol in molecular ratios ranging from about 1 to 1 to about 1.8 to 1. The materials are reacted in the presence of a caustic soda (sodium hydroxide) solution and cooled to a temperature of about 35° to 40° C. which is maintained for 2 to 3 days. The mixture is then neutralized with hydrochloric acid while being cooled with ice to maintain a temperature not in excess of 40° C., followed by allowing the mixture to separate into layers and washing the resin layer with water.

Martin is a text, three separate portions of which have been cited. The first part, comprising pages 23 and 24, reports the separation of 3,3′,5,5′-tetra-methylol - 4,4′ - dihydroxydiphenylmethane from a mixture of phenol, formaldehyde and sodium hydroxide. It states that tetramethyloldihydroxydiphenylmethane is formed by the self-condensation of the salts of trimethylolphenol in aqueous solution. The reaction occurs with the elimination of water and formaldehyde between 2 moles of the trialcohol with the reaction favored by a high ratio of formaldehyde to phenol such as 2 or 3 to 1. Page 97 of Martin discusses certain "Resoles" or one-stage resins, referring specifically to a "Water-Soluble Resin" and a "Casting Resin." Page 127 of the reference reports a process in which evolution of formaldehyde, which took place when p-cresol dialcohol was heated in the presence of sodium ions, ceased when all sodium ions were removed.

### The Rejections

The examiner rejected claim 1 as "obvious under 35 U.S.C. 103 over Thompson et al., Schrader et al., or Dietz in view of Martin" and claims 2 and 3 "as obvious under 35 U.S.C. § 103 over the Martin text considered together with Amann et al and Schrader et al." He rejected claims 4 to 6 and 8 as "obvious over Reboulet considered with the Martin text taken in view of Schrader et al, and Amann et al." The board principally adopted, as its own, the examiner's reasons given in support of those rejections, adding only certain brief comments. We will therefore direct our discussion primarily to the examiner's statement of the rejection, referring to the board's comments where such reference appears to be helpful to an understanding of our position.

### Opinion

In Graham v. John Deere Co. of Kansas City, 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966), the Supreme Court set forth broad guidelines for observing the requirements of § 103 of the Patent Act of 1952. It cast the emphasis in terms of an inquiry into the obviousness of the subject matter sought to be pat-

ented. In an oft-quoted passage, it stated, 383 U.S. at 17, 86 S.Ct. at 694:

\* \* \* the § 103 condition, which is but one of three conditions, each of which must be satisfied, lends itself to several basic factual inquiries. Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or nonobviousness of the subject matter is determined. \* \* \*

██ In making that legal determination, the other language of § 103 must also be considered. We are required by that statute to evaluate the claimed subject matter *as a whole* in the light of the differences between the claim and the prior art. In addition, the Supreme Court referred to the need, in determining patentability, to "guard against slipping into use of hindsight," citing Monroe Auto Equipment Co. v. Heckethorn Mfg. & Sup. Co., 332 F.2d 406, 412 (6th Cir. 1964). *Monroe*, in turn, relies for that proposition on this court's opinion in In re Sporck, 301 F.2d 686, 689, 49 CCPA 1039, 1042–43 (1962).

In *Sporck*, this court stated, id. at 1045, 301 F.2d at 690:

\* \* \* Here, neither the record nor the facts of which we are able to take judicial notice supplies the factual data necessary to support the legal conclusion of obviousness of the invention at the time it was made. We are unwilling to substitute speculation and hindsight appraisal of the prior art for such factual data. \* \*

With these preliminary concepts in mind, we turn to an analysis of the claims.

### The Rejection of Claim 1

In connection with claim 1, appellants state:

The novel and distinguishing aspect of the process as defined in claim 1 includes reacting the critical range of 2.5 to 3.0 moles of formaldehyde with one mole of phenol under conditions which lead to condensation of the same to that critical stage wherein the product becomes a water-insoluble, alcohol-soluble polymethylol phenol condensate having a mole ratio of 2.3 to 2.52 moles of formaldehyde per mole of phenol. It is important to note that the reactants are cooled to 10° C. or lower to arrest condensation during and after the addition of acid. The polymethylol phenol condensate formed in this manner, while extremely reactive, is still water-insoluble and can be washed with water to remove inorganic material which would make the product a poor dielectric.

It is, of course, true that the processes disclosed in the references cited against claim 1 are specifically different from that claimed process, and from each other, in that they disclose different proportions of reactants, different catalysts, different reaction procedures or durations, or different steps in treating the product after condensation.

The question before us is whether the claimed process is obvious in view of the teachings of *any* one of Thompson, Schrader or Dietz, taken with the teachings of Martin. The examiner has pointed out various aspects of the reference processes which correspond to appellants' process. However, he has failed to explain why the use of the specific features of the claims which are lacking in the primary reference processes might be so suggested in the secondary reference as to establish obviousness of the claimed subject matter as a whole to a person having ordinary skill in the art. In this respect the rejection appears to have been guided by "hindsight." Despite this observation, we have given full and independent consideration to the positions of the examiner and the board and to the references which are now relied on to support the rejection. Our conclusion is that the rejection of claim 1 does not constitute a proper rejection under 35 U.S.C. § 103.

At the outset, it is implicit in claim 1 that the reactants are supplied in the ratio of 2.5 to 3.0 moles of formaldehyde per mole of phenol.[6] One of the basic references, Schrader, does meet that ratio as well as the recited ratio of the sodium hydroxide employed. However, Schrader lacks a teaching of arresting the condensation as required by the claim and employing the specified subsequent treatment which provides appellants' product.

None of the references discloses that cooling of the mixture to arrest condensation should be followed by adding sulfuric acid to the mixture and keeping the temperature below 10° C. Thus, Thompson specifically discloses neutralizing the condensate before cooling and does not disclose stopping the condensation at that point to provide a condensate having the mole ratio recited in the claim. Dietz teaches cooling the condensate and adding hydrochloric acid to it while cooling with ice, "the temperature not being allowed substantially to exceed about 40° C." This reference was described by the examiner as "of great interest." But Dietz, in addition to using a substantially lower mole ratio of the formaldehyde and phenol reactants than appellants, does not suggest employing the much lower temperature of less than 10° C. required by the present process. The secondary reference, Martin, likewise lacks any suggestion of cooling to the required temperature.

In affirming the examiner as to claim 1, the board commented:

 * * * The mere fact that the references fail to teach the production of a water-insoluble product is of no consequence since in determining the patentability of process claims the steps comprising the process are the essential features for consideration,

not the particular substance obtained from its application. * * *

That contention is answered by the fact that the combination of steps making up the claimed process is novel and the references, for the reasons already stated, do not demonstrate that the differences between the claimed process and the prior art are such that the claimed subject matter as a whole would have been obvious at the time the invention was made.

*The Rejection of Claims 2 and 3*

As to claims 2 and 3, the examiner stated that the claimed products "are obvious to one skilled in the art having the tetramethylol - 4, - 4' - dihydroxydiphenylmethane disclosure of Martin before him" and that obviousness is further shown by consideration of Martin with the secondary references to Amann and Schrader. More specifically, concerning the secondary references, he stated:

Amann et al., is relied upon to show products from phenol and excess formaldehyde formed in the presence of NaOH. The reference is also relied on to show the solubility of such products in such solvents as alcohols, acetone, esters, etc. The reference is further relied on for its comprehensive discussion of the possible reactions of phenol and formaldehyde.

Schrader et al is relied upon to show viscous liquid products from the action of excess formaldehyde upon phenol.

The tetramethyloldihydroxydiphenylmethane product of Martin is not shown to be in the form of a heavy syrup or to be condensed to the extent that it is water-insoluble but soluble in organic liquids including methanol as these limitations are included within the claims. In particular, the examiner has not taken the position that the product is water-

6. This comment is occasioned by the examiner having, in his Answer for the first time, questioned the language of claim 1 by stating that "the amount of phenol is *not* specified." We think the only plausible interpretation of the claim is that its specification of the number of moles of aqueous formaldehyde and sodium hydroxide is in relation to a single mole of phenol.

insoluble[7] or advanced any reason why it would be obvious to make it so.

In particular, he has not pointed out anything in the secondary references which suggests that the Martin procedure might be modified to provide a condensation product having the specified properties, much less how to so modify it. The Amann products are described as showing "a more or less great degree of solubility in water." In fact, the product of Amann's Example 7, cited by the examiner as having the required 2.50 mole ratio, is stated to be "readily soluble in water." The "catalytic" or "nucleated" resin of Schrader is also described as "water-soluble." While Schrader does not disclose the solubility characteristics of its "base" resin with regard to water, the examiner does not contend that it would be any different than the reference products in that respect.

Also, the examiner criticized the phrase "degree of concentration" in claims 2 and 3 as "not being of recognized significance or defined in the claims" and deemed that limitation not to be "of patentable import." However, that phrase is employed and effectively defined in the specification and was suggested by an examiner for use in claims 2 and 3 for defining the property of the condensate being "water insoluble but soluble in organic solvents including methanol." Appellants state that the language in question would be just as meaningful if the word "degree" were

not in it. They further state that the claim means "condensed to a state of water insolubility but organic solvent solubility." That understanding of the phrase seems to us to be correct and to specify a condition which we are not satisfied is either taught or made obvious by the combinations of prior art relied upon in the rejection.

In adopting the examiner's reasons for rejecting claims 2 and 3, the board observed:

* * * it is noted that the record does not indicate that the prior art polymethylol phenol products are not water-insoluble when tested under the same conditions i. e., temperature and pH, as the claimed products. * * *

It is significant on that point that the claimed products are disclosed and claimed as water-insoluble without any limitation being set out as to temperature. Appellants state that "even at room temperature [their polymethylol phenol condensate] is substantially insoluble in water." On the other hand, nothing is pointed out in the record to demonstrate that any of the reference materials are other than water soluble.[8] The rejection of claims 2 and 3 will not be sustained.

### The Rejection of Claims 4 to 6 and 8

The rejection of claims 4 to 6 and 8 adds Reboulet to the references cited to sustain the rejection of product claims 2 and 3. It is the theory of the rejection that, in view of Reboulet's combination

---

7. It is of interest that the statement of the board beginning "[t]he mere fact that the references fail to teach the production of a water-insoluble product," quoted previously in this opinion in discussing claim 1, was made in its original decision when claim 1 stood rejected on "any one of * * *, Amann et al., Thompson et al., Schrader et al. .* * *, Dietz, * * *, each alone, or in view of * * * Martin." Those include all the references relied on against claims 2 and 3.

8. The solicitor refers to a statement in Martin's discussion of a "Resole" de-

scribed as a "Water-Soluble Resin" that "the reaction period may have to be shortened and the dehydration conducted at a very low temperature; otherwise, water solubility will be lost." That appears in a portion displaced 73 pages from the part relied on by the examiner as disclosing the tetramethylol-4, 4'-dehydroxydiphenylmethane and relates to material formed by the reaction of 1.25–1.35 moles of formaldehyde per mole of phenol. We do not find that statement indicative of obviousness of the claimed condensate. The examiner and board apparently had the same opinion, since they made no reference to the statement.

of phenolic resins with lignin, it would be obvious to combine the particular condensate of the latter claims, which was itself considered obvious, with alkali lignin to provide a resin-forming composition. The examiner stated that "only the expected results are obtained" from the combination he suggested.

In contesting that rejection, appellants state:

Reboulet discloses that alkali lignin can be molded by itself, or can be mixed with various materials such as clay, wood fiber or that it can be used as an extended with phenol formaldehyde resins in molding compounds. There is not the remotest suggestion in Reboulet of using with alkali lignin a polymethylol or condensate of polymethylol phenol or any phenolic material that will cross-link with the alkali lignin. As Reboulet states, the alkali lignin can be molded alone and there is no disclosure that the phenol formaldehyde is more than an extender or that it has any coaction with the alkali lignin.

It is apparent that Reboulet does not teach that there is cross-linking between the lignin and the phenol formaldehyde resin. The reference designates the latter material only broadly and does not disclose it as having the properties of appellants' condensate as defined in the claims. It thus is plain that appellants do obtain a result which is new so far as the references are concerned; a product which is capable of producing a resin adhesive wherein the novel polymethylol phenol condensate is cross-linked with the alkali lignin. The record provides no evidence which satisfies us that such product or the process of producing it is obvious.

The decision of the board is reversed.

Reversed

ALMOND, J., concurs in the result.

WORLEY, Chief Judge (dissenting).

Considering the state of the prior art reflected in the references cited by the Patent Office in this twice-argued appeal, it seems to me the examiner and board had ample reason for concluding that the subject matter of appellants' claims is not patentable.

I am particularly concerned with the manner in which the majority treats claims 2 and 3. In substance, those claims recite a water *insoluble,* organic solvent soluble, polymethylol phenol condensate[1] or heavy syrup having a com-

---

[1] Some background will be helpful in understanding the scope of claims 2 and 3. Appellants react phenol with excess formaldehyde to prepare (at least transitorily or as an intermediate) monomeric trimethylol phenol, having the formula:

$$HOCH_2 - C_6H_2(OH)(CH_2OH) - CH_2OH$$

That compound, according to appellants' specification and brief, is water *soluble.*

It obviously has a combined formaldehyde-phenol ratio of *3.0.* During appellants' synthesis procedure, trimethylol phenol is said to condense further to form compounds of the formula:

$$HOCH_2 - \left[ C_6H_2(OH)(CH_2)(CH_2OH) \right]_n - OH$$

Where n=2, a "dimer" of trimethylol phenol is obtained, having a combined formaldehyde-phenol ratio of *2.5.* Further condensation of that "dimer" with

bined formaldehyde-phenol ratio of 2.3 to *2.52* and free of inorganic salts.

As the majority observes, the examiner found those claimed products to be "obvious to one skilled in the art having the tetramethylol-4,4'-dihydroxydiphenyl-methane disclosure of Martin" alone before him or considered further with Amann and Schrader.

The Martin reference discloses, in pertinent part:

It is now well established that in addition to the mononuclear phenol alcohols tetramethyloldihydroxydiphenylmethanes are important products of the *later stages of the reaction between phenol and formaldehyde.* Walker first reported the separation of 3,3', 5,5' - tetramethylol - 4,4' - dihydroxydiphenylmethane from a phenol-formaldehyde reaction mixture in 1935. A few years later Seebach made a detailed study of the compound * * *.

\* \* \* \* \* \*

Seto has reported the synthesis of the tetramethylol derivatives of 2,2'-[2] and 2,4'-dihydroxydiphenylmethane in addition to the previously known 4,4'-isomer. The tetramethylol derivative of 2,2'-dihydroxydiphenylmethane melts at 132–133°C., of the 2,4'-isomer at 117–118°C., and of the 4,4'-isomer at 145–146°C. Martin had previously obtained a compound melting at 130–132°C. which showed the correct analysis for a tetramethyloldihydroxydiphenylmethane. Although it was never proved, it would appear from the melting point that the compound obtained by Martin may have been the tetramethylol derivative of 2,2'-dihydroxydiphenylmethane.

Tetramethyloldihydroxydiphenylmethane is formed by the self-condensation of the salts of trimethylolphenol in aqueous solution. The reaction occurs by the elimination of water and formaldehyde between 2 moles of the trialcohol and appears to be a first-order reaction dependent on the concentration of trimethylolphenol. This would mean that significant quantities of the tetraalcohol would be formed only in the later stages of a reaction between phenol and formaldehyde after appreciable quantities of the trialcohol had accumulated in the system. *A high ratio of formaldehyde to phenol, e.g., in the neighborhood of 2 or 3 to*

other molecules of trimethylol phenol is said in appellants' brief to lead to formation of "trimers," "tetramers," "pentamers" and the like, all possessing a combined formaldehyde-phenol ratio of *less than 2.5.* As appellants' specification states:

It has been found in carrying out the reaction of phenol with formaldehyde, *as practiced in this invention,* that the product consists of a *mixture of monomeric polymethylol phenols* and *low molecular weight condensation products.*

\* \* \* \* \* \* \* \*

\* \* \* it is difficult to obtain a combined ratio of formaldehyde to phenol above 2.5, and *examples* given in this *specification* range in value from 2.45 to 2.52. The corresponding n values, therefore, range from 2.08 to 1.92. In other words, the *predominating chain length* is about *two phenol units.*

\* \* \* \* \* \* \* \*

* * * If the degree of condensation is too low the product is too soluble in water and it is impossible to wash it free of salts without severe loss of material. However, *any low condensed product can be used if the inorganic salts are removed by some other means, such as by ion exchange.* On the other hand, if the condensation is carried too far the number of free methylol groups is insufficient to properly cure the lignin and form a water resistant infusible resin. We have found that the degree of condensation corresponding to a combined formaldehyde-to-phenol mole ratio of 2.3 to 2.52 is suitable for the purpose of this invention. This corresponds to an average chain length of 3.3 to 2.0. [Emphasis supplied.]

2. The 2, 2'-compound corresponds to the "dimer" appellants state is obtained when n=2 in fn. 1, supra. The 2, 4'- and 4, 4'-isomers, of course, are also included within the scope of the claims.

1, *also favors the formation of the compounds,* but they have been detected even at a ratio of 0.8 to 1. A long reaction period would favor the tetraalcohol; a somewhat shorter reaction period would give more of the trialcohol. Many of these points are well illustrated by the data presented by Freeman and Lewis. [Emphasis supplied.]

Martin also discloses processes for the manufacture of "some of the more common resoles [3] or One-Stage resins," stating:

CASTING RESIN. For *each mole* of phenol, *2.5 moles of formaldehyde* as formalin solution is employed. The catalyst may be any alkali such as NaOH, KOH, or LiOH. Approximately 15 grams of 10% caustic per mole of phenol is typical with the reaction mixture being held at reflux temperature for $1\frac{1}{4}$–$1\frac{1}{2}$ hours. The resin is then *cooled* and *neutralized* to a pH of 5.5–6.5 with lactic, citric, or tartaric acid. * * * [Emphasis supplied.]

Said the examiner:

* * * It is to be noted (and emphasized) that the tetramethylol compound relied on in Martin has 4 (four) methylol groups and a methylene bridge (joining the two phenolic nuclei) * * *, has 5 "combined" formaldehyde groups for two phenolic nuclei, this giving a "combined formaldehyde-to-phenol ratio" of 2.50 to 1. It is thus seen that the tetramethylolphenol compound of the prior art meets the quoted recitation from appealed claim 2.

With respect to the claim limitation "and having a degree of condensation such that it is water insoluble but soluble in organic solvents including methanol," the examiner noted that appellants' specifica-

tion discloses that their "polymethylol phenol" has a "predominating chain length" of "two phenol units." He concluded:

* * * clearly, the tetramethylol-4,4'-diphenylmethane of Martin has a chain length of *two phenol units* and a combined formaldehyde to phenol ratio of 2.50:1. It is respectfully submitted that no *novel* or *unobvious* polymethylol phenol has been *discovered* or *claimed;* * * * [Emphasis supplied.]

The board agreed.

Disposition of this appeal has not been facilitated by certain seeming inconsistencies between the arguments made in appellants' brief and the content of their specification and claims, and the resultant uncertainty engendered as to just what appellants are claiming. Their argument with respect to Martin is predicated on Martin's asserted disclosure of only dimers of trimethylol phenol whereas, according to appellants' brief, their reactants are condensed "to the point where n is equal to 2 to 5" and claims 2 and 3 are purportedly directed to a condensate *mixture* "consisting of dimers to pentamers." With a condensate mixture consisting *only* of dimers to pentamers, it would appear, of course, quite impossible to have a combined formaldehyde to phenol ratio of greater than 2.5. Appellants have not explained how they obtain a condensate having a combined formaldehyde-phenol ratio of greater than 2.5, e. g. 2.52, without the presence of a fair proportion of trimethylol phenol monomer (at least 4% if one assumes the 2.52 ratio material contains only monomer and dimer or, if one assumes the presence of "trimers" etc. in the "mixture," a substantially higher percentage of monomer corresponding to that required to maintain the claimed ratio at 2.52. In view of that, one also might wonder how the seemingly *necessary*

---

3. According to Kirk-Othmer, Encyclopedia of Chemical Technology, Vol. 10, p. 336–337 (1953), resoles are low molecular weight phenol-formaldehyde resins "which are soluble in alkalies, alcohols, ketones, and, *to some extent, water.* They consist mainly of a complex mixture of phenol alcohols with a relatively high hydroxyl content." [Emphasis supplied.]

presence of *water-soluble* trimethylol phenol in the condensate is consistent with the claim recitation that the condensate product is water *in*soluble. To me it is evident that:

(1) accepting appellants' arguments in the brief at face value, their condensate product of 2.5/1 ratio contains no trimethylol phenol monomer whereupon (a) claims 2 and 3 necessarily read directly on the tetramethylol derivatives of 2,2′- or 4,4′-dihydoxydiphenylmethane which Martin discloses to be known compounds and (b) discussion of Martin's failure to disclose specific inherent properties of those materials is wholly immaterial,[4] or

(2) Following the lead of appellants' specification, their condensate product necessarily contains a substantial portion of water-soluble trimethylol phenol and does not therefore distinguish over any conventional A-Stage or resole resin.

With respect to process claim 1 the majority seems to rely heavily on the limitation therein that the reactants are cooled to 10°C. while adding sulfuric acid. In view of the fact that (1) most of the references in the record before us disclose that the reactants must be cooled both to arrest condensation and also during neutralization, and (2) the fact appellants' specification attaches no particular significance to that limitation in any of its examples, it seems to me the board was correct in finding that limitation to be well within the skill of the art. Appellants certainly do not appear to be in a favorable position to argue its criticality. In re Cole, 326 F.2d 769, 51 CCPA 919 (1964).

With respect to the remaining claims, I am satisfied that the examiner and board were correct in concluding that particular subject matter is obvious in view of the prior art. I would affirm.

4. It is pertinent to note, as the board and solicitor point out, that appellants have presented no evidence that the prior art products disclosed by Martin do not have

the claimed characteristic properties. Appellants' argument in the brief does not take the place of evidence in the record on that score. In re Cole, infra.