57 CCPA

**Application of George V. ELTGROTH.**

**Patent Appeal No. 8237.**

United States Court of Customs and Patent Appeals.

Jan. 8, 1970.

———♦———

George V. Eltgroth, pro se. Melvin M. Goldenberg, Arlington, Va., of counsel.

Joseph Schimmel, Washington, D. C., for the Commissioner of Patents. Raymond E. Martin, Washington, D. C., of counsel.

Before RICH, Acting Chief Judge, ALMOND, BALDWIN, LANE, Judges, and RAO, Chief Judge, sitting by designation.

ALMOND, Judge.

This is an appeal from the decision of the Patent Office Board of Appeals affirming the rejection of claims 1–15, all the claims in appellant's application entitled "Method for Influencing Organisms." [1]

The invention relates to the control of growth, aging and degeneration in living organisms, particularly to appellant's alleged discovery of what appears to be a key for the solution of the problems associated with these life processes. Appellant states in his specification that, while he is convinced that the factors crucial to the aging process are not amenable to chemical detection, he concludes that these factors are isotopes of the elements upon which we rely for our sustenance and the life processes themselves. It is proposed that the different

1. Serial No. 290,908 filed June 27, 1963, alleged to be a continuation of serial No. 823,354 filed June 29, 1959.

diffusion rates of these elements and their compounds are a factor leading to a progressive change in the isotope abundance spectrum within the body. The specification then states:

By using the mass spectrometer to run abundance profiles of the various isotopes for the blood components, specialized tissues and vital organs on subjects of different ages and with different pathological conditions, the correlation between these factors, pathology and age is established. Those isotopes which are critical to the aging process or give rise to pathological conditions are thus isolated.

With this information in hand, agents, such as chelating agents or substances which will enter into preferred reversible reactions with the isotopes whose concentration is to be reduced (or enhanced) are experimentally determined upon, and administered until the desired reduction, or change in balance, is achieved, as needed to reduce the effective age of the organism, or abate the pathological condition.

No more specific teaching than the above appears. No examples are presented. We are told, however, of the many possibilities laid open for exploration, not the least exciting of which is the permanent maintenance of a level approximating that of age twenty-five to thirty.

The following claims are sufficiently representative of those on appeal:

1. The method of influencing the effective age of a living organism which comprises modification of the abundance of a specific isotope present in such organism.

7. The method of influencing age correlating phenomena in a living organism which comprises modification of the isotope abundance profile in such organism.

12. The method of influencing a living organism which comprises modifying in such organism the abundance profile of specific isotopes of specific elements in a manner different than any attendant modification of the abundance profile of said elements, the latter profile taking into account all of the quantities of isotopes of said elements which are present in such organism.

The examiner rejected all of the claims on each of the following grounds: (1) as lacking statutory utility under 35 U.S.C. § 101; (2) as being based on a disclosure failing to satisfy either the "enabling" or "best mode" portions of 35 U.S.C. § 112; (3) as vague and indefinite under 35 U.S.C. § 112, in not pointing out the invention with particularity to distinguish from the prior art; and (4) as reading on the prior art, i. e., anticipation under 35 U.S.C. § 102.

The references relied upon are:

Bersworth et al.
(Bersworth) 2,875,129 February 24, 1959

Geneva, 1955 International Conference on the Peaceful Uses of Atomic Energy, Report of the U. S. Delegation, Vol. 1, pp. 150 and 250–251, "Modification of Radiation Response."

Foreman, "The Use of Chelating Agents for Accelerating Excretion of Radio Elements," J. A. Ph. A. Sci. Ed., Vol. XLII, No. 10, Oct. 1953, pp. 629–632.

Bessman et al. (Bessman), "Chelation," Ann.Int. Med., Vol. 47, No. 5 Nov. 1957, pp. 1036–1040.

Vaughan et al. (Vaughan), "EDTA (Versene) for Removing Fission Products from the Skeleton," J. Pharm. and Pharmacology, Vol. 6, No. 4, Apr. 1954, page 266.

Spencer et al. (Spencer), "Effect of EDTA on Radio Strontium Excretion in Man," PS.E.B.M., Mar. 1958, pp. 565–7.

Bair et al. (Bair), "Synergistic Action of EDTA and Radiation on Yeast," Science, Vol. 127, No. 3302 (11 Apr. 1958).

Cohn et al. (Cohn), "Experimental Treatment of Poisoning from Fission Products," A.M.A. Arch.

Indust. Health, Vol. 14, Dec. 1956, pp. 533–538.

Bessman discloses that a chelate is a compound formed between a metallic ion and an organic molecule having two neighboring groups capable of simultaneously combining with the metal to form a ring structure. The reference further states that there are many naturally occurring chelating agents, including amino acids, carbohydrates and proteins, and that those normally present probably serve a physiological function since it can be demonstrated that at normal concentrations they can affect metabolic activity. Most of the complex reactions upon which the vital processes of living organisms depend, the author believes, are influenced at some stage by natural chelates. The use of the chelating agent, ethylenediaminetetraacetic acid (EDTA), for the lowering of excessively elevated serum calcium levels and as a deleading agent for the treatment of lead poisoning is described. Many antimicrobial and antituberculous drugs are said to be chelating agents.

Foreman discloses that administration of EDTA assists elimination, through urinary excretion, of radioactive isotopes such as yttrium–91 and plutonium 239.

Bersworth teaches the elimination of nickel or lead by administering a calcium chelate.

The remaining references may be summarized as disclosing the use of chelating agents as detoxification agents in cases of metal and fission product poisoning.

The examiner's position with respect to the rejection based on the prior art was, in essence, that the breadth of the claims caused them to be "readable" on the reference disclosures. It was his opinion that the claims were met also by the "historical living-organism isotope-profile-modifications, or 'fallout' in events known as 'Hiroshima', 'Nagasaki' 'Eniwetok' and 'Bikini' * * *."

In affirming the examiner's rejections, the board failed to make specific mention of ground (3) supra. With respect to the sufficiency of appellant's disclosure under 35 U.S.C. § 112, it remarked:

We have studied the specification and have come to the conclusion that no one, no matter how skilled, could carry out appellant's alleged invention with the information contained therein. * * *

The entire specification is in the nature of a prophecy or speculation on the part of appellant. It lacks any tangible disclosure of specific isotopes and definite methods for altering their abundance.

Related was the board's observation that:

Page 4 vaguely refers to the possibility of using chelating agents but this much is disclosed by the many references cited by the Examiner. These show the elimination of various isotopes and heavy metals from a living organism by administration of chelating agents and this leads to the next rejection of the claims as fully met by this prior art under 35 U.S.C. 102. * * *

* * * * * *

In our opinion the claims present no distinction over the procedures of the references.

The rejection for lack of statutory utility was commended upon also:

As we have already noted, appellant's disclosure is prophetic. At most it suggests a theory which has not been accepted or even recognized by the prior art. Under such circumstances proof of utility is prerequisite to the grant of a patent but no evidence of any kind has here been presented. In re Citron, 51 CCPA 852; * * * · 325 F.2d 248; 139 USPQ 516; In re Novak et al., 49 CCPA 1283; * * * 306 F.2d 924; 134 USPQ 335. Particularly apropos to the present application is the following statement by the Supreme Court in Brenner v. Manson, 833 OG 1349; 148 USPQ 689:

" * * * But a patent is not a hunting license. It is not a reward

for the search, but compensation for its successful conclusion. '[A] patent system must be related to the world of commerce rather than to the realm of philosophy.' "

Appellant's position is that once his disclosure in association with other prior art has advanced the reader to the point where the balance of the acts to be performed are of a "purely ministerial nature, time consuming and expensive though they may be," he has met the requirements of 35 U.S.C. § 112. Conceding that considerable work remains to be done, appellant contends that the question is whether the remaining work is necessarily inventive in character.

Appellant further argues that there is no basis under 35 U.S.C. § 101 for imposing different or higher standards of utility for inventions involving compositions of matter or methods of treatment of organisms than for the purely mechanical inventions. He states in his brief that the

> * * * disclosure is teleologic in nature, which means that since the steps are formulated in terms of the end result, the readjustment of the steps in the light of results obtained by the worker in the field, must inevitably lead to success, and this without any tincture of invention, for the applicants' disclosure leaves nothing but ministerial, non-inventive, though time-consuming activities to be performed on the part of the laboratory worker. With this teleologic or closed logic loop type of disclosure there is no margin for a miscarriage which could result in lack of utility. Hence, the requirement of utility is intrinsically met with a disclosure of this nature.

With respect to the rejection based on 35 U.S.C. § 102, appellant contends that the references relied upon fail to disclose his invention in that they are concerned with modification of the *element* abundance profile, whereas he is concerned with modifying the abundance of a given *isotope* contributing to the total presence of a selected element while retaining the

presence of other isotopes of the same element. Moreover, it is argued, the references deal with elimination of poisons which reduce life span, and none mentions concern with prolongation of the normal life span of a healthy organism.

We view appellant's argument concerning the adequacy of a disclosure under 35 U.S.C. § 112 as essentially a restatement in his terms of the test applied in this court, namely, whether the specification is clearly sufficiently definite to guide those skilled in the art to its successful application. This court has often observed that minutiae of descriptions or procedures perfectly obvious to one of ordinary skill in the art yet unfamiliar to laymen need not be set forth. It has even been said that some experimentation, provided it is not an undue amount, is permissible. However, nothing must be left to speculation or doubt.

While we agree with the legal proposition inherent in appellant's position with regard to 35 U.S.C. § 112, his argument leaves us unpersuaded of error in the Patent Office's position. Appellant has been no more specific in his disclosure than in that portion quoted, supra. We agree with the board that the specification "lacks any tangible disclosure of specific isotopes and definite methods for altering their abundance." Not one example is given. Not one isotope producing aging is identified, nor are "agents, such as chelating agents or substances which will enter into preferred reversible reaction with the isotopes" specified. Moreover, appellant has not applied the law to the facts of his case in that he has failed to show how knowledge available to those skilled in the art would enable them to make and use his invention despite the lack of specific disclosure. It appears to us, after careful study of the specification, that appellant has provided no more than a speculative theory or hypothesis, highly significant though it may be, inviting others to undue experimentation to bring the invention to fruition.

**922**

Nor are we able to agree with appellant that the requirements of 35 U.S.C. § 101 have been met. Undoubtedly, the *alleged utility* of control of the aging process in living organisms and the significant beneficial results flowing therefrom is adequate. Yet, there is a conspicuous absence of proof thereof. This court's recent decisions in In re Ferens, 417 F.2d 1072, 57 CCPA ——, and In re Buting, 418 F.2d 540, 57 CCPA ——, explore in depth the requirements of proof of utility. Suffice it to say, we find the instant record too speculative to satisfy the requirement of 35 U.S.C. § 101.

Having carefully considered appellant's arguments and the authorities cited in support thereof, we are unconvinced of error in the board's decision with respect to the rejection based on 35 U.S.C. § 112, paragraph 1, and 35 U.S.C. § 101. The view we take with regard to the preceding renders it unnecessary to consider the other issues raised by the appeal. Accordingly, the decision is affirmed.

Affirmed.