58 CCPA

**Thomas Lynn FIELDS, et al., Appellants,**

**v.**

**Lloyd H. CONOVER and Robert B. Woodward, Appellees.**

**Patent Appeal No. 8516.**

United States Court of Customs and Patent Appeals.

July 1, 1971.

Edward A. Conroy, Jr., Stamford, Conn., attorney of record, for appellants. Harry H. Kline, Stamford, Conn., of counsel.

Nicholas E. Oglesby, Jr., Wilmington, Del. (Connolly & Hutz), Wilmington, Del., attorneys of record, for appellees.

Before RICH, ALMOND, BALDWIN, LANE, Associate Judges, and LANDIS, Judge, United States Customs Court, sitting by designation.

RICH, Judge.

This appeal is from the decision of the Board of Patent Interferences awarding

priority to Conover and Woodward (hereinafter Conover), the senior party. Fields, Wilkinson and Kende (hereinafter Fields) appeal solely on the ground that Conover's application, serial No. 209,269, filed July 11, 1962, does not support the counts, which were copied from Fields' patent No. 3,167,579, issued January 26, 1965, on an application filed October 22, 1962. Neither party took testimony. We reverse.

### THE INVENTION

The subject matter of this interference is substituted 4, 10–dioxo–5–hydroxy–1, 2, 3, 4, 4a, 9, 9a, 10–octahydroanthracenes. Count 1 is as follows subparagraphing and numbering of the relevant carbon atoms supplied):

A compound selected from the group consisting of those of the formula

[A4194]

wherein

X is selected from the group consisting of hydrogen, chlorine and bromine,

R is selected from the group consisting of hydrogen, carboxy, lower carbalkoxy and phenyl lower carbalkoxy,

$R_1$ is selected from the group consisting of hydrogen and methyl,

$R_2$ is selected from the group consisting of hydrogen, methyl and formyl,

Z is selected from the group consisting of cyano[,] carboxy, and lower carbalkoxy and

Y is selected from the group consisting of hydrogen and cyano.

Count 2 is for 8–chloro–1, 2, 3, 4, 4a, 9, 9a, 10–octahydro–4, 10–dioxo–5–hydroxy–2–anthraceneglycine, a species encompassed within the genus of count 1 which may be represented by the following structural formula:

[A4195]

Appellant Fields' patent discloses that "The novel compounds of the present invention are particularly useful as chelating, complexing or sequestering agents for polyvalent metallic ions," that they are also "biologically active and have been found to possess antibacterial activity," and that they "may also be useful in the synthesis of physiologically active antibiotics of the tetracycline series." Fields' patent is assigned to American Cyanamid Co., while Conover's application seems to be assigned to Chas. Pfizer & Co., Inc.

Conover relies on an enormous application having 196 typed pages of specification which in the words of its introductory paragraph,

* * * relates to a process of preparation of antibacterial agents. More particularly, it is concerned with the discovery of new and novel [sic] synthetic routes for the preparation of known as well as new tetracycline products. It is also concerned with the new and useful tetracycline products obtained thereby, as well as with the new intermediates of the process.

The Conover process starts with known 3, 4, 10–trioxo–1, 2, 3, 4, 4a, 9, 9a, 10–octahydroanthracenes and converts them to tetracyclines by means of a multi-step reaction sequence in which several alternative routes exist for the conversion of various of the starting materials to various of the end products. This reaction sequence is illustrated by a flow sheet on which there are eleven structural formulae, one of which is number XXII:

[A4196]

On the following pages, the substituents in the above formula are defined as follows:

* * * X is selected from the group consisting of hydrogen, chloro, fluoro, trifluoromethyl, amino, lower alkylamino, alkanoylamino containing 2 to 4 carbon atoms, lower alkyl and monosubstituted lower alkyl wherein the substituent is selected from the group consisting of fluoro, lower alkylmercapto, lower alkoxy, amino, lower alkylamino, and alkanoyloxy and alkanoylamino each containing 2 to 4 carbon atoms; and YR wherein Y is selected from the group consisting of oxygen and sulfur; and R is selected from the group consisting of lower alkyl, benzyl and alkanoyl containing 2 to 4 carbon atoms;

$X_1$ is selected from the group consisting of hydrogen, chloro, lower alkyl, mono fluoro substituted lower alkyl, and YR wherein Y and R are as previously defined;

$X_2$ is selected from the group consisting of hydrogen, lower alkyl, hydroxy, mercapto, and YR in which Y and R are as previously defined;

A is selected from the group consisting of hydrogen, lower alkyl, fluoro and $B_2OCHB_3$—wherein $B_2$ is lower alkyl and $B_3$ is selected from the group consisting of hydrogen and lower alkyl;

$A_1$ is selected from the group consisting of hydrogen, lower alkyl and fluoro;

* * * * * *

$R_2$ is selected from the group consisting of $X_3$ and $CO_2X_6$ (mixed anhydride) in which [$X_3$ is selected from the group consisting of hydrogen, lower alkyl and benzyl and] $X_6$ is lower alkyl;

$R_3$ and $R_4$ when taken together with the nitrogen atom to which they are attached form a nitrogen heterocyclic ring selected from the group consisting of piperazyl, piperidyl, morpholinyl, pyrryl, pyrrolidyl, 2–(lower carbalkoxy) pyrrolidyl, and thiomorpholinly;

$R_3$ and $R_4$ when taken separately are each selected from the group consisting of hydrogen, aralkyl containing a total of up to 10 carbon atoms, amino, mono– and di–lower–alkylamino, acyl containing 1 to 4 carbon atoms, phenyl and mono–substituted phenyl wherein the substituent is selected from the group consisting of lower alkyl and lower alkoxy; and $CH_2B_1$ wherein $B_1$ is selected from the group consisting of hydrogen, lower alkyl, lower carbalkoxy, and mono–substituted lower alkyl said substituent being selected from the group consisting of fluoro, hydroxy, lower alkoxy, amino, mono– and di–lower–alkylamino, lower carbalkoxy, and acylamino (preferably acetylamino), and acyloxy (preferably acetoxy) each containing 2 to 4 carbon atoms;

Provided that only one of said $R_3$ and $R_4$ substituents is selected from the group consisting of acyl containing 1 to 4 carbon atoms; and when one of said $R_3$ and $R_4$ substituents is mono–lower–alkylamino the other is lower alkyl; and when one of said $R_3$ and $R_4$

substitutents is selected from the group consisting of amino, di–lower–alkylamino, phenyl, mono–substituted phenyl, lower carbalkoxyalkyl, the other of said $R_3$ and $R_4$ substitutents is selected from the group consisting of hydrogen and lower alkyl;

\* \* \* \* \* \*

$X_5$ is selected from the group consisting of $-CH_2$, $-CHOH$, $-CH$ ($O\overset{O}{\overset{||}{CH}}$) and $C{=}O$; \* \* \*.

We have set forth the above definitions at length to emphasize the scope of the Conover teaching. However, it is conceded by Fields that the counts "find support" in the Conover application in the sense that "the particular group of compounds defined by the counts" *may be arrived at* by "a judicious choice from among the incredibly large number of possible substituents \* \* \* assigned to formula XXII \* \* \* of the Conover et al. application." Specifically, compounds defined by formula XXII lie within count 1 if (1) Conover's X is hydrogen or chloro at the 8–position, (2) $X_1$ is hydrogen, (3) $X_2$ is hydroxy at the 5–position, (4) A is hydrogen, (5) $A_1$ is hydrogen, (6) $R_2$ is hydrogen or lower alkyl, (7) $R_3$ is hydrogen or methyl, (8) $R_4$ is hydrogen or methyl, and (9) $X_5$ is $CH_2$ or $CH$ (carboxy).[1]

## THE BOARD'S OPINION

The board, starting with one of the 100 substituted amino acetates listed in Conover's Example LXIII,[2] traced its way through Example LXV, Example LXXXVI, and the first sentence of the last paragraph of Example LXXXVII to arrive at a chemical differing from that recited in count 2 only in that it contains

a 5–methoxy group in place of the 5–hydroxy group recital in that count. For the final reaction, the board relied on the last two sentences of the last paragraph of Example LXXXVII, which state:

> The ether \* \* \* groups present are converted to hydroxy \* \* \* groups by treatment with hydrogen bromide *in accordance with known procedures*. The amphoteric products are obtained by careful neutralization with $NaHCO_3$.

The board specifically found that "procedures for converting aromatic ethers to aromatic hydroxy compounds are well within the skill of the art," relying on "A well known textbook of organic chemistry" published in 1950 which states that 48% hydrobromic acid is a superior reagent for ether cleavage and on two working examples in Conover which teach analogous reactions with other compounds. In the particular reaction sequence traced by the board, this final reaction is said to result in the compound recited in count 2, and, on this basis, the board held that "the disclosures of these examples [i. e., Examples LXIII, LXV, LXXXVI, and LXXXVII] are linked so that by following out these processes the compound of count 2 must inevitably be formed." Accordingly, the board awarded priority to Conover on both counts.

## APPELLANTS' ARGUMENTS

Fields presents his arguments in various forms, but essentially they come down to two contentions: (1) Conover's specification does not teach how to make the compound recited in count 2 or, in general, the compounds recited in count 1[3] and (2) Conover's specification does not contain a written description of the

---

1. Conover concededly cannot support all the limitations of count 1. However, Fields has made no issue of this.

2. Conover has been more cautious, starting in the brief with "the known compound methyl 3–methoxybenzoate" and tracing through ten reactions exemplified in the specification before arriving at the compound with which the board started.

3. Fields does not differentiate between the specific compound recited in count 2 and the other members of the genus recited in count 1. We shall, therefore, assume that if Conover's specification provides sufficient how-to-make support for the species of count 2, it provides sufficient how-to-make support for the entire genus of count 1.

**1390**

invention recited in the counts. As Conover points out,

> * * * the single issue to be decided is whether the disclosure of the Conover et al application satisfies the first paragraph of 35 U.S.C. 112 in such a manner as to provide clear and unambiguous support for the interfering subject matter.

However, neither the how-to-use nor the best-mode requirement is in issue here.

## OPINION

### A. *How-to-Make Requirement*

Fields does not contest the sufficiency of Conover's teachings concerning the first thirteen steps of the fourteen-step reaction sequence starting with "the known compound methyl 3–methoxybenzoate" and ending with the compound recited in count 2. The controversy is over whether the language "The ether * * * groups present are converted to hydroxy * * * groups by treatment with hydrogen bromide in accordance with known procedures," together with knowledge already in the public domain,[4] was sufficient to teach those skilled in the art how to accomplish the last step of the reaction sequence.

Fields contends that the above disclosure is inadequate because "the conversion of aromatic ethers to aromatic hydroxy compounds is by no means a standardized procedure since the process conditions vary immensely depending upon the starting material substrate." Fields points out, and Conover partially concedes, that "the determination of the proper process conditions for the conversion of a 5–methoxy–4, 10–dioxo–1, 2, 3, 4, 4a, 9, 9a, 10–octahydro–2–anthracene-glycine to its corresponding 5–hydroxy derivative without concomitant side reactions would unquestionably require considerable experimentation." Fields then

cites In re Brown, 329 F.2d 1006, 51 CCPA 1254 (1964), where, in judging the sufficiency of a reference which allegedly rendered the claimed compositions of matter obvious, we quoted I Robinson on Patents 451 (1890) to the effect that:

> * * * the description must place the invention in the possession of the public as fully as if the art or instrument itself had been practically and publicly employed. In order to accomplish this, it must be so particular and definite that from it alone, *without experiment* or the exertion of his own inventive skill, any person versed in the art to which it appertains could construct and use it. [*Id.* 329 F.2d at 1011, 51 CCPA at 1260; emphasis ours.]

The conclusion we are apparently asked to draw from this is that Conover's teaching is defective because compounds within the scope of the counts could not be made without "considerable experimentation" to determine appropriate process limitations for the last step in the reaction sequence.

We do not think that the foregoing quotation from Robinson or our reliance on it in *Brown* supports Fields' apparent view that *undue* experimentation would be required here. In context ("without experiment *or* the exertion of his own inventive skill"; emphasis ours), the word "experiment" must be taken to refer to *extended* experimentation, or, in other words, to such experimentation that, as of the date of publication of the reference, the invention there allegedly disclosed could not yet fairly be said to have been "in the possession of the public as fully as if the art or instrument itself had been practically and publicly employed." As we recently remarked, a disclosure complies with the how-to-make requirement of 35 U.S.C. § 112 even though "some experimentation, provided it is not an undue amount" (and provided

---

4. There is no suggestion in the crucial example that the "known procedures" there referred to are the same procedures utilized in the other two working examples mentioned by the board, and, of course, those examples were not in the public domain as of the filing date of this application. Accordingly, and contrary to the board's views, we do not consider the teachings therein as supportive of these counts.

that it does not require ingenuity beyond that to be expected of one of ordinary skill in the art), is still required to adapt the invention to particular settings. In re Eltgroth, 419 F.2d 918, 921, 57 CCPA 833, 837 (1970).

In this case, Fields had an opportunity to take testimony to support the position that the determination of the proper process conditions "would unquestionably require considerable [i. e., undue] experimentation," but he did not elect to do so, and both the primary examiner and the board found that Conover's teachings were adequate to teach those skilled in the art how to complete the necessary reaction sequences. On this record, we certainly cannot say that the examiner and the board erred on this point.

### B. *Written-Description Requirement*

Our finding that Conover's specification provides adequate how-to-make support for the counts does not end the case, for a specification may provide adequate teachings of how to make and use subject matter which is subsequently claimed and yet fail to contain a written *description* thereof which complies with the first requirement of the first paragraph of 35 U.S.C. § 112. In re Ahlbrecht, 435 F.2d 908, 911, 58 CCPA 848 (1971).

Fields relies heavily on the fact, conceded by Conover, that

* * * nowhere in all one hundred and ninety-six pages of the Conover et al. specification is a single compound within the counts named or identified by formula or mentioned in any manner.

This fact alone adequately distinguishes this case from In re Risse, 378 F.2d 948, 54 CCPA 1495 (1967), whatever may be the present authority of the broadest rule which may be derived from our opinion therein. Compare In re Lukach, 442 F. 2d 967, 969, 58 CCPA (May 27, 1971). However, the now-claimed subject matter "does not have to be described *in ipsis verbis* in order to satisfy the description

requirement of § 112," In re Lukach, supra, and we do not think it can be said that Conover's specification fails to contain an adequate written description of the subject matter of the counts *solely* because it does not contain *express* (i. e., by name or formula) reference either to one or more of the species contained within count 1 or to the genus recited by count 1 or the species recited by count 2.

To satisfy the written-description requirement, Conover relies upon the previously quoted language from Example LXXXVII, which states that "The ether * * * groups present [on compounds otherwise falling within the scope of the counts] are converted to hydroxy * * * groups," on similar language in Example LXXXIV, and on the following paragraph, which appears early in his application, shortly after the basic flow sheet:

Of the present new compounds [,] of particular value are those containing the following benzenoid moiety:

[A4197]

in which X, $X_1$ and YR are as described above [,] since these compounds are suitable for the preparation of known tetracycline compounds, i. e., where YR is OH and, in addition, new and useful tetracycline compounds not previously described.

1392

Fields points out that YR cannot be OH if it is "as described above," since Y is there defined as oxygen or sulfur and R as lower alkyl, benzyl, or alkanoyl containing 2 to 4 carbon atoms. Nonetheless, despite the seeming inconsistency, we agree with Conover that the above paragraph is highly relevant here and that it would provide *some* "suggestion or guidance," Biel v. Chessin, 347 F.2d 898, 905, 52 CCPA 1607, 1615 (1965), to those skilled in the art, leading them toward selecting compounds within the scope of the counts. However, even when considered in conjunction with Examples LXXXIV and LXXXVII, it falls far short, in our opinion, of the "full, clear, concise, and exact" written description which we have said is necessary to support subsequently added claims. In re Ahlbrecht, supra, 435 F.2d at 911; see also Schriber-Schroth Co. v. Cleveland Trust Co., 305 U.S. 47, 57, 59 S.Ct. 8, 83 L.Ed. 34 (1938) ("the application for a patent cannot be broadened by amendment so as to embrace an invention not described in the application as filed").

Furthermore, this is an even stronger case for the application of this rule, policywise, than was *Ahlbrecht*. Here, Conover is concededly first with an extremely broad discovery, broad claims have already been allowed, and broad, non-elected claims roughly corresponding to Formula XXII are pending which, if allowed, will dominate most, if not all, the scope of Fields' claims. If Conover is allowed to copy Fields' claims merely because the application is sufficient to teach how to make and use the subject matter thereof and points indistinctly and ambiguously in the general direction of that subject matter, the socially valuable incentive to further research and development provided by the opportunity to obtain subservient patents will be consideraby diminished.

For the foregoing reasons, the decision of the Board of Patent Interferences is *reversed* as to both counts.

Reversed.