54 CCPA

**Application of William C. RAINER, Edward M. Redding, Joseph J. Hitov, Arthur W. Sloan and William D. Stewart.**

**Patent Appeal No. 7668.**

United States Court of Customs and Patent Appeals.

June 2, 1967.

Alvin Guttag, Washington, D. C. (C. Edward Parker, Duncan, S. C., of counsel), for appellants.

Joseph Schimmel, Washington, D. C. (Jack E. Armore, Washington, D. C., of counsel), for the Commissioner of Patents.

Before WORLEY, Chief Judge, and RICH, MARTIN, SMITH and ALMOND, Judges.

RICH, Judge.

The appeal is from decisions of the Board of Appeals,[1] affirming the examiner's rejection of claims 2–6, 8–12, 17, 20, and 48–59 in application serial No. 12,339, filed March 2, 1960, entitled "Polyethylene." Claims 18 and 63 have been allowed.

### Introduction

The invention relates to graft copolymers of polyethylene and certain other

---

1. This case was twice before a board consisting of Asp and Lidoff, Examiners-in-Chief, and Behrens, Acting Examiner-in-Chief. The latter wrote both opinions.

compounds, their method of preparation, and articles made thereof. The following claims are typical of those rejected:

2. A process comprising irradiating normally solid polyethylene at a dosage of at least about $2 \times 10^6$ REP in contact with a material selected from the group consisting of a polymerizable ethylenically unsaturated hydrocarbon monomer other than ethylene, halogenated styrene, alkyl acrylates, alkyl methacrylates, dialkenyl oxalates, diallyl phthalate, diallyl maleate, diallyl fumarate, dialkyl maleates and dialkyl fumarates to form a graft polymer.

9. A bottle made of irradiated polyethylene, the irradiation being to an extent of at least $2 \times 10^6$ REP, having grafted thereto a polymer formed by polymerizing a member of the group consisting of a polymerizable ethylenically unsaturated hydrocarbon monomer other than ethylene, halogenated styrene, alkyl acrylates, alkyl methacrylates, N,N-methylene-bis-acrylamide, dialkenyl oxalates, diallyl phthalate, triallyl cyanurate, diallyl maleate, diallyl fumarate, triallyl melamine, dialkyl maleates and dialkyl fumarates on said polyethylene.

17. A graft polymer of irradiated polyethylene with a polymer of an ethylenically unsaturated hydrocarbon monomer, other than ethylene, said polymer of said monomer being formed in the presence of said polyethylene, said irradiation being to an extent of at least $2 \times 10^6$ REP.

49. The process of preparing a shaped article exhibiting dimensional and thermal stability and resistance to oxidative degradation at temperatures up to 250°C. which comprises (1) preparing an intimate mixture of from 60 to 95 parts by weight of (a) polyethylene, and a complementary proportion of from 40 to 5 parts by weight of (b) at least one organic compound selected from the group consisting of monomeric esters of methacrylic acid and monomeric esters of acrylic acid; (2) preparing a shaped article from said mixture, and (3) irradiating said shaped article with high energy, ionizing radiation for a time sufficient to provide a radiation dose of from $36 \times 10^5$ rads to $720 \times 10^5$ rads.

57. A bottle made of irradiated polyethylene, the irradiation being to an extent of at least $2 \times 10^6$ REP, having grafted thereto a polymer formed by polymerizing a material selected from the group consisting of a polymerizable ethylenically unsaturated hydrocarbon monomer other than ethylene, alkyl acrylates and alkyl methacrylates.

Claims 3–6, and 12, 20, and 48 are dependent upon claim 2 and recite additional limitations including the presence of a "free radical engendering compound," an inert atmosphere, a vacuum, an irradiation dosage of at least $6 \times 10^6$ REP [2] and a temperature of at least the transition point of polyethylene. Claim 8 restricts the material in contact with polyethylene in the process of claim 2 to a hydrocarbon monomer.

Claims 10 and 11 restrict the polymer coating of claim 9 to the exterior and interior of the bottle respectively.

Claims 50–54 and 56 are process claims which require the same three basic steps as claim 49. Claim 55 is directed to a shaped article made by the process of claim 49.

Claims 58 and 59 restrict the polymer coating of claim 57 to the exterior and interior of the bottle respectively.

The board affirmed rejections of the appealed claims on the bases of res judicata, obviousness, inadequate disclosure, and indefiniteness (improper Markush group). It relied on In re Rainer, 305 F.2d 505, 49 CCPA 1243 (1962), Lawton

---

2. A REP, as is recognized in the art, is defined as that amount of nuclear radiation which dissipates 93 ergs of energy per gram of tissue producing $1.61 \times 10^{12}$ ion pairs in the process. It is approximately equal to the amount of energy that would be dissipated by a one roentgen X-ray beam in a gram of tissue.

et al., Irradiation of Polymers by High-Energy Electrons, 172 Nature 76–77 (1953) and the following patents:

Cole 2,919,473 January 5, 1960
Brophy 2,670,483 March 2, 1954

In In re Rainer, while reversing as to some claims, we affirmed rejections of several claims in an application of which the present application is a continuation-in-part. The former application was concerned with "condensation products of polyethylene with other polymers and ethylenically unsaturated monomers," characterized as "new cross linked polymers of increased strength and rigidity * * *." These were prepared by the irradiation of polyethylene "in the presence of other non-polar or only slightly polar polymers or ethylenically unsaturated monomers." The following claims are typical of those whose rejection was affirmed:

31. A process comprising irradiating normally solid polyethylene at a dosage of at least about $2 \times 10^6$ REP admixed with a material selected from the group consisting of hydrocarbon polymers containing a plurality of isobutylene units, a liquid partially depolymerized rubber, a liquid butadiene styrene copolymer, a liquid butadiene acrylonitrile polymer, a polymerizable ethylenically unsaturated hydrocarbon monomer other than ethylene, halogenated styrene, alkyl acrylates, alkyl methacrylates, N.N-methylene-bis-acrylamide, dialkenyl oxalates, diallyl phthalate, ethylene glycol dimethacrylate, triallyl cyanurate, diallyl maleate, diallyl fumarate, triallyl melamine, dialkyl maleates and dialkyl fumarates to form a cross-linked polyethylene copolymer.

39. A process comprising irradiating normally solid polyethylene at a dosage of between about $2 \times 10^6$ REP and $200 \times 10^6$ [REP] with high energy radiation equivalent to at least about 750,000 electron volts admixed with a material selected from the group consisting of hydrocarbon polymers containing a plurality of isobuty-

lene units, a liquid partially depolymerized rubber, a liquid butadiene styrene copolymer, a liquid butadiene acrylonitrile polymer, a polymerizable ethylenically unsaturated hydrocarbon monomer other than ethylene, halogenated styrene, alkyl acrylates, alkyl methacrylates, N,N-methylene-bis-acrylamide, dialkenyl oxalates, diallyl phthalate, ethylene glycol dimethacrylate, triallyl cyanurate, diallyl maleate, diallyl fumarate, triallyl melamine, dialkyl maleates and dialkyl fumarates to form a cross-linked polyethylene copolymer.

40. A process according to claim 39 in which said material is a polymerizable ethylenically unsaturated hydrocarbon monomer.

The Lawton et al. (hereafter Lawton) reference describes the irradiation of various polymers and lists those which became cross-linked and those which became degraded. The former include:

Polyacrylic esters
Polystyrene
Polyesters
Nylon
Polyethylene
Chlorinated polyethylene
Chlorosulphonated polyethylene
Natural rubber
GRS
Butadiene-acrylonitrile copolymers
Neoprene-W
Neoprene-GN
Polydimethylsiloxanes
Styrene-acrylonitrile copolymers

Lawton also teaches:

A number of other polymer mixtures, co-polymers, and polymer monomer mixtures have also been found to become cross-linked as a result of irradiation. Although the mechanism of the process is not well established in each of the above examples, some general statements covering possible mechanisms can be made. These, however, will be reserved for future publications.

Brophy discloses the use of a peroxy compound (benzoyl peroxide) in an ir-

radiation polymerization of polyethylene monomer materials.

Cole teaches the desirability, in certain instances, of conducting the irradiation of polymeric materials in an inert atmosphere in order "to minimize oxidation by atmospheric oxygen."

### Res Judicata

The board affirmed the rejection of claims 2–6, 8, 12, 17, 20, and 48 on the ground of res judicata, citing In re Rainer, supra. It reasoned that the reference to graft copolymers in the appealed claims was insufficient to impart the necessary "substantial or critical distinction" from the adjudicated claims. The board noted, without much elaboration, that a changed characterization of the *product* would create no distinction in the process. "The process of claims 39 and 40 of the prior application * * * did not become a new process because appellants changed the label of the product which results from the irradiation * * *." Claims 5, 6, and 48, directed to irradiation in an atmosphere free of oxygen, were not, in the board's opinion, different enough from the adjudicated claims to avoid res judicata, inasmuch as "the prior art well appreciated the desirability of excluding oxidizing gases during irradiation * * *."

■ We have recently restricted the application of res judicata in ex parte patent cases. In re Herr (Patent Appeal No. 7751, decided May 11, 1967), 377 F.2d 610, 54 CCPA ——. We, therefore, apply that doctrine herein only to the extent of precluding consideration of reargument of the issue of the obviousness, in view of Lawton, of the preparation of the cross-linked polymers of the earlier case by the process there disclosed, as discussed in the next section of this opinion.

### Obviousness

The board affirmed the rejection of claims 2, 8, 12, 17, and 20, as obvious in view of Lawton.

Appellants' essential challenge to this decision is based on their characterization of the compounds here involved as *graft* polymers. The Lawton reference makes no mention of graft polymerization. The question, of course, is whether this makes a difference. We think not.

■■ The compounds under discussion in this case were involved in the earlier case. Their properties, of course, have not changed. Appellants seem to urge that their denomination as graft polymers somehow imparts unobviousness to both compounds and process. We think that this contention must fail because the obviousness of neither is properly controverted. Appellants do not contend that these are *different* compounds than those which would be within the contemplation of one of ordinary skill with the reference before him nor that the properties thereof would be unexpected. Characterization is not strong enough a peg to support patentability. Even were appellants to have *discovered* that the obvious compounds might properly be designated "graft polymers," they could not prevail.[3] See De Forest Radio Co. v. General Electric Co., 283 U.S. 664, 51 S.Ct. 563, 75 L.Ed. 1339 (1931).

---

3. Appellants assert that the Patent Office is bound by its tacit admission and the holding of the court in Magat v. Ladd, 234 F.Supp. 603 (D.D.C.1964). There the court observed that the Patent Office had "tacitly conceded" the distinction between graft polymers and cross-linked polymers. The court held that Lawton in no way suggests graft polymers nor is the process disclosed capable of producing them. The evidence in that case apparently showed that cross-linked and graft polymers are mutually exclusive entities. We are not here so impeded, having before us the contrary assertions of both appellants and Patent Office. We have recently emphasized the importance of the identity of the records when the preclusive effect of earlier litigation between the same parties is urged. In re Herr, supra. A fortiori, divergent records *and different parties* forbid the attribution of any preclusive effect. Appellants' "additional" argument, for the patentability of claim 17, based on *Magat*, therefore fails.

Appellants urge that claim 20 is patentable over Lawton for the additional reason that it is limited to irradiation "at a temperature of at least the transition point of the polyethylene." They argue:

The Examiner made no attempt to show that Lawton taught the use of such high temperatures but merely alleged that appellants did not show that the temperature was critical * * *. The issue is not whether the higher temperature is taught to be critical by appellants but whether the higher temperature would be obvious in view of Lawton. There is no suggestion in Lawton of using such high temperatures.

We cannot agree. Criticality must be established before unobviousness can be predicated on the selection of a temperature within the range disclosed by the reference.

Claims 3 and 4, rejected as obvious in view of Lawton and Brophy, concededly stand or fall with claim 2. Accordingly, their rejection is affirmed.

We, therefore, affirm the rejection of claims 2, 8, 12, 17, and 20 for generally the same reasons that we gave in the earlier case.

Claims 5, 6, and 48 were rejected as obvious in view of Lawton and Cole. Appellants urge that the limitations in these claims, viz., a requirement for irradiation "in an inert fluid atmosphere," "in a vacuum," and "in an inert gas atmosphere," render them unobvious.

Appellants' specification teaches that ozone has an adverse effect on polyethylene and its graft copolymers and that it is therefore "frequently desirable" to conduct the irradiation in an inert gas atmosphere and "sometimes desirable" to conduct it in a vacuum. Cole teaches that "in certain instances" irradiation in an inert atmosphere is desirable to minimize oxidation by atmospheric oxygen. We believe Cole's teaching would make obvious the utilization of either an inert atmosphere or a vacuum in a process for the irradiation of polyethylene. The relevancy of Cole's teaching here is in the disclosure of the desirability of irradiation *in the absence of oxygen*. We therefore attach little importance to Cole's failure to mention the use of a vacuum.

We also feel that the criticality of the use of a vacuum is questionable. The language of the specification as a whole certainly would not lead one to think that the nature of the ambient atmosphere constituted a critical part of appellants' invention. "Good ventilation," in fact, is mentioned as an alternative to the inert gas or vacuum. We affirm the rejection of claims 5, 6, and 48 for obviousness.

*Inadequate Disclosure*

Claims 2–6, 8–12, 17, 20, 48, and 57–59 were rejected on the ground that the disclosure was inadequate to support them. Our affirmance of the obviousness rejection makes it necessary to discuss only claims 9–11 and 57–59.

The rejection on inadequate disclosure was made by the board under Rule 196 (b). The board directed attention to the following portion of appellants' specification:

Instead of mixing polyethylene with any of the above materials, it is also possible to employ grafted polymers, wherein ethylenically unsaturated monomers are grafted to polyethylene. Suitable monomers for grafting purposes include isoprene, cyclopentadiene, styrene, α-methyl styrene, alkyl substituted styrenes, such as O-vinyl toluene, p-vinyl toluene, m-vinyl toluene, and p-ethyl styrene, dialkenyl benzenes, e. g., para-divinyl benzene, ring halogenated styrenes, such as o-chlorolstyrene, p-chlorostyrene, 2,4-dichlorostyrene and 2,6-dichlorostyrene, etc. The hydrocarbon monomers are preferred for grafting purposes.

Also, there can be used monomers such as alkyl acrylates and methacrylates, e. g., methyl acrylate, ethyl acrylate, methyl methacrylate, butyl acrylate, octyl acrylate, butyl methacrylate, octyl methacrylate, N,N-methylene-bis-acrylamide, polyallyl esters, e. g., di-

allyl phthalate, diallyl oxalate, ethylene glycol dimethacrylate, triallyl cyanurate, bis-allyl carbonates, diallyl maleate, and diallyl fumarate, dialkenyl oxalates, e. g., diallyl oxalate, triallyl melamine, dialkyl maleates and fumarates, e. g., diethylmaleate and diethyl fumarate, etc.

Appellants' examples include descriptions of the irradiation of polyethylene bottles coated with various monomers. It is noted that, when ethylene glycol dimethacrylate was used, "The coating solidified but did not wet the polyethylene" and that "a readily peelable coating was formed." The parties agree that no graft copolymer was formed in this example. Other examples specifically refer to the product of irradiation of p-divinyl benzene and of styrene as graft copolymers. (A claim directed to the latter was allowed.) Examples are also given of the irradiation of about half a dozen other monomers without any reference to the formation of graft copolymers. The rationale of the rejection is stated in the solicitor's brief:

> The rationale of the above noted rejection is adequately stated by the Board of Appeals * * *. Essentially, it is based on the fact that, although the present specification catalogs a large number of monomers * * * which can be irradiated with polyethylene to form graft cross-linked copolymers, that catalog of monomers includes ethylene glycol dimethacrylate which further on in the specification * * * is shown *not* to form a graft cross-linked copolymer * * *. Consequently, the Board properly concluded that the disclosure would be considered adequate as to those monomers actually shown by the examples (or otherwise in the original disclosure) to form graft cross-linked copolymers with the polyethylene * * * but inadequate as to any other monomers or the very broad category of "polymerizable ethylenically unsaturated hydrocarbon monomers", which include monomers such as vinyl

acetylene not even mentioned in the appellants' catalog of monomers.

The thrust of the inadequate disclosure rejection is that appellants have claimed more broadly than they have invented. It is maneuvered into the shadow, at least, of section 112 by the observation that the specification gives no indication whether these misnomers for which there is no specific example will behave on irradiation like styrene, which forms a graft copolymer, or like ethylene glycol dimethacrylate, which does not.

The adequacy of the disclosure is a function of the nature of the disclosure. In re Cavallito, 282 F.2d 363, 48 CCPA 720 (1960). In chemical cases, important considerations include the type of reactions, the state of the art, the representative nature of the examples, and the breadth of the claims. The question which must be asked in every case is whether the claims are, in fact, reasonable definitions of the inventions disclosed.

The present case is unusual in that appellants' specification is the evidence of its own inadequacy. The board properly relied upon it. We think the board properly rejected claims 9–11 for inadequate disclosure. Each of those claims includes several polyallyl esters. But the only polyallyl ester whose irradiation is reported did not form a graft copolymer. We, therefore, affirm the rejection of claims 9–11.

We think the board erred in its affirmance of the rejection of claims 57–59. (Claim 57 is quoted above.) These claims are said by appellants to be drawn to those classes of compounds for which working examples were provided. The board did not agree that working examples had been provided. Apparently because of inconsistency in the specification, the board refused to infer the production of graft copolymers in the examplse of polyethylene-monomer irradiation. We feel that a fair reading of the specification as a whole demands such an infer-

ence. The specification states, as the introduction to its catalog of monomers, that "it is often possible to employ grafted polymers." It then gives examples of monomer irradiation, making clear in one example that a graft copolymer was not formed. It seems clear to us that the specification as a whole implies the production of graft copolymers in each example where there is no contrary indication. We therefore reverse the rejection of claims 57–59 on the ground of inadequate disclosure.

Claims 57–59 were also rejected for the presence therein of Markush groups of diminished scope in relation to the Markush group of claim 9. Since we have affirmed the rejection of claim 9 there is no longer a basis for this objection and we reverse this rejection.

### Claims Refused Entry

Claims 49–56, which were presented after final rejection for the purpose of provoking an interference with a patent[4] from which they were copied with modifications, were refused entry by the examiner for inadequate support. Appellants' brief delineates the issue:

The only issue as to support is whether the application discloses the sequence of three method steps called for by claims 49–56 (R. 35). These three method steps in order are:

(1) Preparing an intimate mixture of polyethylene with the monomer.

(2) Preparing a shaped article from the mixture; and

(3) Irradiating the shaped article.

More precisely, the question is whether appellants' specification discloses the ir-

radiation of a shaped intimate mixture of polyethylene and monomer.

■ Appellants point to the disclosure of the irradiation of polyethylene-monomer *blends* of a certain thickness and argue that the irradiation of a sheet is thus disclosed. And a sheet, in appellants' opinion, is a "shaped article." It seems to us that the essence of appellants' argument is that all polymer-monomer mixtures, since necessarily of *some* thickness, constitute shaped articles. We do not believe that "shaped" has this minimal meaning in appellants' claims. We could not attribute any significance to the second step—"preparing a shaped article from said mixture"—if all mixtures were inherently shaped articles.

Appellants also urge us to consider the entire teaching of the specification, particularly certain examples allegedly disclosing the irradiation of polyethylene-*polymer* blends, and to imply in it a teaching of interchangeability of the polymers and monomers. In our reading of the specification we find no such implication. The rejection of claims 49–56 is affirmed.

### Summary

The rejection of claims 2–6 8–12, 20, 48–56 is affirmed. The rejection of claims 57–59 is reversed. The decision of the board is modified.

Modified.

WORLEY, C. J., and ALMOND, J., concur in the result.

MARTIN, J., participated in the hearing of this case but died before a decision was reached.

---

4. Patent No. 3,079,312 to Alsys, Feb. 26, 1963, to E. I. duPont de Nemours and Company, assignee.